1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

                          ----oo0oo----

11

12  RYAN G. McAFEE,
                                 NO. CIV. 05-00227 WBS KJM
13            Plaintiff,

14       v.                      <u>MEMORANDUM OF DECISION</u>

15  METROPOLITAN LIFE INSURANCE
    COMPANY, PEOPLESOFT
16  INCORPORATED LONG-TERM
    DISABILITY PLAN,
17
              Defendants.
18  _____/

19
                          ----oo0oo----
20

21            Plaintiff Ryan McAfee and defendant Metropolitan Life

22  Insurance Company ("MetLife") dispute the value of plaintiff's

23  performance-based stock options for purposes of calculating his

24  monthly disability benefits.  On November 17, 2008, the matter

25  was tried to the court, sitting without a jury.  The following

26  memorandum constitutes the court's findings of fact and

27  conclusions of law pursuant to Federal Rule of Civil Procedure

28  52(a).

                               1

I.    Factual and Procedural History

     A.    Background

          Plaintiff was Vice President of Research at PeopleSoft Inc. in Pleasanton, California. (Defs.' Resp. to Pl.'s Undisputed Facts 2:3-7.)  On October 3, 1999, plaintiff was injured in a fall resulting in the paralysis of the lower half of his body. (Pl.'s Resp. to Def.'s Undisputed Facts 2:6-9; Compl. ¶ 8.)  Despite his injury, plaintiff continued to work remotely from his house in Canton, Ohio, from December 1999 to June 2001. (Supp. Admin. R. ("SAR") 3044.)  He then moved back to California in June 2001 and "worked alternately 2-3 days a week from home and 2-3 days a week in the Pleasanton office." (Id.)  However, due to the physical and mental strain involved, plaintiff stopped working on May 7, 2002. (Id. at 3045, 3416.)

          Plaintiff filed a claim for Long-Term Disability ("LTD") benefits pursuant to PeopleSoft's employee benefit plan, which was funded and administered by MetLife (id. at 3051-54) and governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.  Plaintiff began receiving payments in November 2002, but MetLife subsequently terminated plaintiff's benefits due to a lack of evidence supporting a "continued disability" as defined by the plan. (SAR 2782-83.)  Plaintiff appealed the decision; he argued that he not only qualified for LTD benefits, but also that MetLife was underpaying him by not considering his performance-based stock options in calculating his payment amount. (Id. at 2782-83.)

          After plaintiff's appeal, MetLife reinstated plaintiff's LTD benefits but rejected his view that the LTD-

2

benefit calculation should include performance-based stock options. (Id. at 3048.)  Under the plan, LTD benefits were based on a claimant's "predisability earnings," which were defined as "gross salary or wages from [the] Employer as of the day before . . . Disability began," including "commissions and/or performance bonuses averaged over the previous 12 months." (Sullivan Decl. Ex. A at 86.)

Plaintiff filed suit under 29 U.S.C. § 1132(a)(1)(B) (Docket Nos. 1, 4), which provides for civil actions to recover disability benefits under an ERISA plan.  In its Order dated May 23, 2006, the court concluded that the term "performance bonuses" in the plan "clearly encompasses the incentive stock options at issue here, . . . and that [MetLife's] interpretation to the contrary was unreasonable." (May 23, 2006 Order 12.)  The court subsequently remanded the case to MetLife in order to recalculate plaintiff's LTD benefits.  (Id. at 14.)

B.   Proceedings on Remand

1.   Plaintiff's Proposal

On July 6, 2006, plaintiff's counsel wrote a letter to MetLife with the following proposal to determine the value of plaintiff's stock options:

> The income earned from the stock options is reflected on [plaintiff's] W-2 forms as ordinary income and on the Schedule D as long-term capital gain income.  The best evidence of the earnings from the stock options are [plaintiff's] W-2's and income tax return/Schedule D for the relevant period.

(SAR 3302.)  This proposal yielded "predisability earnings" of $568,540.26, which included plaintiff's base salary of $175,315.44 and earnings from the exercise of stock options

3

totaling $393,224.82.  (Id. at 3418.)  According to the terms of
the plan, these "predisability earnings" would result in a
disability payment of $25,000 per month, less plaintiff's receipt
of Social Security income.  (Id. at 3302.)

           2.   Mr. Skwire's Report

           MetLife consulted two experts in order to respond to
plaintiff's proposal and calculate plaintiff's benefit payments.
The first expert was Daniel Skwire, a principal and consulting
actuary at Milliman Inc.  (Id. at 3398.)  In Mr. Skwire's report,
he discussed at length his belief that stock options were not
covered by PeopleSoft's employee benefit plan.  (See generally
id. at 3398-3410.)  Mr. Skwire ultimately concluded, however,
that "[i]f MetLife is required to determine benefits . . . as if
stock options were included in Predisability Earnings, then it
should consider only the option value of stock options granted in
the 12 months prior to disability and not the ensuing income
pertaining to exercises of those options."  (Id. at 3400.)

           Mr. Skwire believed that "performance bonuses averaged
over the previous 12 months" did not refer to stock options
exercised during that period because employees have complete
control over when they exercise their options.  In other words,
plaintiff's proposal would create a "moral hazard."  (See id. at
3404-05 ("The moral hazard problem is the tendency of individuals
to alter their behavior because of insurance. . . . [T]he
insurance itself provide[s] an incentive for the insured to try
to collect the benefits." (quoting Kenneth Black & Harold D.
Skipper, Jr., Life and Health Insurance (13th ed. 2000)).)  In
contrast, Mr. Skwire stated that interpreting the plan to refer

4

1  to stock options <u>granted</u> did not create a moral hazard "because

2  the granting of options is controlled by the employer, not the

3  employee." (<u>Id.</u> at 3405.)

4          3.   <u>Dr. Findlay's Report</u>

5          The second expert consulted by MetLife was M. Chapman

6  Findlay, Ph.D.  At the time of his report, Dr. Findlay was the

7  president and director of Fin Fin Inc. and had previously held

8  positions as Professor and Chairman of the Department of Finance

9  and Business Economics at the University of Southern California.

10  (<u>Id.</u> at 3389-90.)  Dr. Findlay's analysis essentially followed

11  two steps: (1) identifying the relevant stock options and (2)

12  applying the Black-Scholes model to determine their value.

13          a.   <u>Identifying the Relevant Stock Options</u>

14          Like Mr. Skwire, Dr. Findlay rejected plaintiff's

15  proposal to calculate disability payments using the stock options

16  exercised during plaintiff's final twelve months at PeopleSoft.

17  Instead of addressing the "moral hazard" issue, however, Dr.

18  Findlay explained that "exercise occurs at the holder's

19  discretion and has no necessary relation to contemporaneous

20  performance." (<u>Id.</u> at 3367.)  Dr. Findlay continued, "This is

21  somewhat similar to putting each year's bonus check in a drawer,

22  cashing 5 or 6 at once (except this year's), and claiming that to

23  be this year's bonus." (<u>Id.</u>)

24          Dr. Findlay proceeded to review the stock options

25  granted during plaintiff's last twelve months at PeopleSoft,

26  which spanned from May 7, 2001, to May 6, 2002. (<u>Id.</u>)  Plaintiff

27  received 12,500 option-shares on May 11, 2001; 20,000 option-

28  shares on January 4, 2002; and 12,000 option-shares on April 15,

2002, which together totaled 44,500 option-shares.  (Id. at 3368.)  Dr. Findlay found this number concerning: "This figure is more than twice the 20,000 [plaintiff] claimed to receive on average . . . .  As shown in the table, the average [for] 1995-2002 appears to be more like 16,000."  (Id.)  Accordingly, Dr. Findlay first decided to exclude the 12,500 shares granted in May 2001, explaining,

> [G]iven his disability contentions, it is hard to imagine that the awards from 1999 onward were for "superior performance."  It has been suggested that the company was rewarding him for dealing with his problems and/or that the position carried a basic option package (which might vary from year to year on profit and performance). . . .
>      Under the latter construction, it would appear that either by accident or "gaming," two years' worth of grants are represented in the 44,500 and the 2001 grant[] should be dropped.

(Id.)

     Dr. Findlay then turned to the options granted in January and April 2002, and again noted that "[g]iven the declaration of disability . . . it seems unlikely that this was a period of accelerating superior performance."  (Id. at 3369.)  Further, Dr. Findlay observed that during this time, PeopleSoft's stock price fell by roughly one-half and that the April 2002 grant approximated the corresponding decrease in the value of the January 2002 grant.  (Id. at 3368, 3540.)  Accordingly, he found it would be reasonable to "assume . . . that the 12,000 share grant . . . in April was a defacto repricing of the January grant without bothering to cancel it."  (Id. at 3369.)

     By eliminating the May 2001 grant and considering the April 2002 grant a "defacto repricing," Dr. Findlay arrived at "a range of 12,000-20,000 shares."  (Id.)  He selected the midpoint

1  of this range, 16,000 option-shares, which corresponded to the
2  average number of option-shares granted per year from 1995 to
3  2002. (Id. at 3368, 3369.)

4        b.   Applying the Black-Scholes Model

5        After identifying the relevant stock options, Dr.
6  Findlay proceeded to apply the Black-Scholes model to value them.
7  As Dr. Findlay explained, the Black-Scholes model is essentially
8  a formula that considers several variables in order to determine
9  the value of a stock option. (See id. at 3370.)  In applying the
10 Black-Scholes model, Dr. Findlay made certain assumptions
11 regarding (1) the volatility of the underlying stock and (2)
12 special restrictions on employee stock options ("ESOs") as
13 compared to typical stock options.

14       i.   Volatility

15       Since the holder of a stock option can determine when
16 to exercise it, options "are only exercised when 'in the money' .
17 . . . Hence, . . . options increase in value as risk [(i.e.,
18 volatility)] increases." (Id.)  Under the Black-Scholes model, a
19 stock option can be valued by calculating the volatility of the
20 underlying stock with reference to the stock's historical prices.
21 (See id. at 3372.)

22       Dr. Findlay concluded, however, that the use of
23 PeopleSoft's historical data was inappropriate for measuring
24 volatility.  He found that PeopleSoft's historical data did not
25 "conform to any of the stochastic processes assumed in the
26 [Black-Scholes] model." (Id.)  In other words, there was no
27 positive correlation between the volatility of the stock and its
28 future price; when volatility peaked, "the stock invariably

1  fell." (Id.) Dr. Findlay also contended that tempering the

2  value-enhancing effect of PeopleSoft's volatility was appropriate

3  because volatility suggests "a large . . . probability of firm

4  failure." (Id.) Accordingly, Dr. Findlay "assume[d]

5  representative values for volatility": a value of 0.3

6  representing average risk, and a value of 0.5 representing "very

7  high risk near the bounds of instability." (Id.)

8       Using the stated, ten-year maturity on plaintiff's

9  stock options, Dr. Findlay applied both the 0.3 and 0.5

10 volatility measures to each of plaintiff's twelve stock-option

11 grants occurring between March 31, 1995, and April 15, 2002.

12 (Id. at 3375.) This yielded two prices for each stock-option

13 grant. (Id.) He averaged the prices for each level of

14 volatility across all of the stock-option grants to arrive at

15 values of $9.10 per share and $11.70 per share, respectively.

16 (Id. at 3378.)

17             ii.  Special Restrictions on ESOs

18      After obtaining these prices, Dr. Findlay discussed

19 special restrictions on ESOs that can decrease their value.

20 Specifically, employees cannot sell or hedge their ESOs, they can

21 only exercise them; due to this characteristic, "there is little

22 dispute that ESOs are worth less than the simple [Black-Scholes]

23 value." (Id. at 3376.) After reviewing a 2004 presentation to

24 the Financial Accounting Standards Board ("FASB"), Dr. Findlay

25 concluded that these restrictions on ESOs reduced their value by

26 roughly forty to fifty percent. (See id.)

27      Dr. Findlay multiplied the average prices ($9.10 and

28 $11.70 per share) by 16,000 option-shares and obtained $187,200

8

and $145,600, respectively.  After discounting these values by
forty to fifty percent in light of the special restrictions on
ESOs, he averaged the results, yielding $74,000.  (Id. at 3378.)
According to MetLife's plan, this value would provide an
additional $3700 to plaintiff's monthly benefit payment.  (Id.)

### 4. MetLife's Decision

In a letter dated October 13, 2006, MetLife rejected
plaintiff's proposal to calculate his LTD benefits based on the
stock options he exercised during his final twelve months of
employment.  (Id. at 3415-20.)  Instead, MetLife adopted Dr.
Findlay's calculation of plaintiff's LTD benefits.  (Id. at 3419-
20.)  MetLife also relied on Mr. Skwire's report to explain its
decision.  (Id. at 3418.)

Citing Mr. Skwire's report, MetLife first rejected
plaintiff's proposal by asserting, "Even if 'predisability
earnings' under the Plan were interpreted to include awards of
stock options as 'performance bonuses,' under the plain meaning
of the Plan, the 'bonus' would be the award of the option, not
the sale of the stock."  (Id.)  Accordingly, to calculate
plaintiff's predisability earnings, MetLife stated it "must
determine the value of the performance-based stock options
awarded in the 12 months preceding the last date worked."  (Id.)

MetLife proceeded to explain Dr. Findlay's analysis.
First, MetLife noted that plaintiff received 44,500 option-shares
during his final twelve months at PeopleSoft; however, MetLife
observed that this was "the final year before [plaintiff]
declared that he was disabled from working, raising questions
about whether he was capable of performance so exceptional in

9

that year that he would have been awarded a number of shares far in excess of the average award in past years." (Id.)

As to the May 2001 grant, MetLife relayed Dr. Finlay's opinion that "these options plainly had nothing to do with [plaintiff's] performance in the key year and therefore should be excluded from the Plan's definition of 'performance bonuses.'" (Id.)  Similarly, the April 2002 grant was an "option 'repricing'" in which "PeopleSoft issued another 12,000 shares . . . in an attempt to rectify what they saw as an injustice." (Id.)  Accordingly, "16,000 options [was] the appropriate number to use in computing the value of the stock option shares for the key year." (Id.)  Without detailing Dr. Finlay's application of the Black-Scholes model, MetLife provided his conclusion that plaintiff should receive an additional $3700 per month in LTD benefits.  (Id. at 3420.)

5.   Plaintiff's Appeal and the F&M Report

Plaintiff appealed MetLife's valuation of his stock options.  In his appeal, plaintiff included a report produced by William Michaels and Kevin Henry of the consulting firm Freeman & Mills Inc. ("F&M Report").  Mr. Michaels is a Vice President and shareholder at Freeman & Mills, a certified public accountant, and former tax and audit partner at Coopers & Lybrand LLP.  (Id. at 3439.)  Mr. Henry is also a Vice President and shareholder at Freeman & Mills; previously, he was a director of an international investment banking practice.  (Id.)

The F&M Report, like Mr. Skwire's and Dr. Findlay's reports, interpreted the plan to calculate LTD benefits based on stock options "granted in the last 12 months of [plaintiff's]

10

employment with PeopleSoft, which ended on May 7, 2002." (Id. at 3340.)  Accordingly, the F&M Report proceeded to value the 12,500 option-shares granted on May 11, 2001; the 20,000 option-shares granted on January 4, 2002; and the 12,000 option-shares granted on April 15, 2002.  (Id. at 3441.)  Like Dr. Findlay, the F&M Report employed the Black-Scholes model as "an appropriate approach for options valuation."  (Id. at 3443.)

        Aside from these similarities, the F&M Report and Dr. Findlay's analysis diverged in several respects.  First, the F&M Report did not adjust the number of option-shares to 16,000 as Dr. Findlay proposed; rather, the F&M Report criticized his adjustment as a "departure from the terms of the LTD plan" for which Dr. Findlay "fail[ed] to provide any acceptable justification."  (Id. 3448-49.)  Second, rather than "assume representative values for volatility" (id. at 3372), the F&M Report calculated volatility at each grant date using PeopleSoft's historical stock prices (id. at 3445-46).  Finally, rather than account for the special restrictions on ESOs by taking a forty to fifty percent discount from the options' Black-Scholes values, the F&M Report applied the following provision from FASB's Statement of Financial Accounting Standards ("FAS") 123R--Accounting for Stock-Based Compensation:

> [T]he inability to sell or hedge an employee share option effectively reduces the option's value . . . .  To reflect the effect of those restrictions . . . on employee options relative to transferable options, this Statement requires that the fair value of an employee share option . . . be based on its expected term, rather than its contractual term.

(Id. at 3443.)

        As a publicly traded reporting company, PeopleSoft

complied with FAS 123[1] by calculating and disclosing values for the volatility of its stock and the expected term of its stock options. (Id. at 3445.)  The F&M Report used these values to apply the Black-Scholes model to the 44,500 option-shares granted to plaintiff during the twelve months preceding his final day at PeopleSoft.  Ultimately, the F&M Report concluded that plaintiff's stock options provided an additional $711,510 to his "predisability earnings." (Id. at 3447.)  This would bring his LTD benefit payment to the maximum of $25,000 per month, less plaintiff's receipt of Social Security income. (Id.)

### 6.   Criticisms of Dr. Findlay's Report

The F&M Report included several criticisms of Dr. Findlay's analysis.  As mentioned previously, the F&M Report considered Dr. Findlay's use of 16,000 shares rather than 44,500 shares to contravene the terms of the plan. (Id. at 3448.)  The F&M Report also criticized Dr. Findlay's treatment of volatility and the non-transferability and non-hedgability of ESOs. (Id. at 3449-50.)  The F&M Report contended that both variables should have been calculated using FAS 123R and the Securities and Exchange Commission's ("SEC") Staff Accounting Bulletin ("SAB") 107.[2]

Plaintiff also provided a declaration in which he

---

    [1]    FAS 123 was the predecessor of FAS 123R.  The differences between the two standards were not relevant to the F&M Report's valuation of plaintiff's stock options.

    [2]    SAB 107 provides the SEC's interpretation of FAS 123R. In pertinent part, SAB 107 confirms that the diminution of value of ESOs due to their non-hedgability and non-transferability is best calculated by applying the expected term of the option rather than its contractual term. (Id. at 3444.)

contested some of Dr. Findlay's assumptions.  First, plaintiff
stated that the April 2002 grant was not a "de facto repricing"
of the January 2002 grant.  (<u>Id.</u> at 3517.)  Rather, plaintiff
explained that "the April 2002 option grants were the annual
performance stock option grants given to [him] as part of [his]
annual review."  (<u>Id.</u>)  Plaintiff continued, "When PeopleSoft
repriced stock options, they would cancel the lot of stock
options being repriced, and the repricing would be documented and
reflected in my stock option report."  (<u>Id.</u>)  This occurred in
December 1998, when PeopleSoft repriced options it had granted in
April 1998.  (<u>Id.</u>)

        In addition, plaintiff disagreed with the assumption
that his disability precluded him from "superior performance"; he
explained,

> I was able to meet my high performance standards
> adequately at my job, but at a tremendously high and
> increasingly excessive price.  My tenure and experience
> at PeopleSoft resulted in my possessing a vast knowledge
> of PeopleSoft products and the industry that allowed me
> to perform better than my peers in most respects.
> However, I was physically a wreck, and the demands of the
> job in the face of my injury and its consequences was
> absolutely killing me.

(<u>Id.</u> at 3518.)

        7.  <u>Dr. Findlay's Response</u>

        Dr. Findlay prepared a response to the F&M Report.
Regarding his use of 16,000 option-shares instead of 44,500, Dr.
Findlay explained that stock options "are not readily amenable to
analysis employing the time frames specified in the disability
policy."  (<u>Id.</u> at 3538.)  He characterized the F&M Report as
"forc[ing] ESOs into the contract terms, assum[ing] they are more
like cash bonuses than wages, and focus[ing] on the 12 months

prior to the declaration of disability." (<u>Id.</u>) He stated, "I cannot even find stock options mentioned in the Plan, no less with an unambiguous 12 month . . . look back rule." (<u>Id.</u> at 3545.) Dr. Findlay proceeded to label his approach a "quasi-equity framework" that captured the "long-run expectation" of the parties. (<u>Id.</u> at 3538, 3547.)

To further support his use of 16,000 option-shares, Dr. Findlay noted that an exhibit to plaintiff's declaration described the May 2001 grant as an "annual performance" bonus; Dr. Findlay concluded, therefore, that these options related only to performance preceding the relevant time period and were "off the table." (<u>Id.</u> at 3539.) As to the April 2002 grant, Dr. Findlay stated that his hypothesis that it was a "'de facto' repricing" was only "one justification for [his] use of 16,000 shares"; plaintiff's declaration was therefore "irrelevant." (<u>Id.</u>)

As to the F&M Report's use of FASB and SEC standards, Dr. Findlay contended that these standards overestimated the value of plaintiff's ESOs. (<u>Id.</u> at 3543-45.) Since FAS 123R sought to estimate the "cost" of stock options to companies, FASB's traditionally "conservative" approach would dictate a calculation method that erred on the side of reporting a higher compensation expense. (<u>Id.</u>)

8. <u>MetLife's Decision on Appeal</u>

On appeal, MetLife stood behind its previous valuation of plaintiff's LTD benefits. MetLife preferred Dr. Findlay's "reasonable approximation of the replacement of predisability income, taking into account the stock options that may reasonably

1  have been based on performance during the relevant period." (<u>Id.</u>

2  at 3522.)  As to the F&M Report, MetLife agreed with Dr. Findlay

3  that "it [was] unreasonable to believe that [plaintiff] received

4  two to four times the value of stock options in the year leading

5  up to his date of disability than he had ever received before

6  based on performance." (<u>Id.</u>)  MetLife asserted, moreover, that

7  "it [was] inconceivable that the valuation proposed by

8  [plaintiff's] consultants . . . would have been intended by

9  PeopleSoft and MetLife." (<u>Id.</u>)

10        9.   <u>Proceedings Before this Court</u>

11        After MetLife made its final determination as to the

12  value of plaintiff's stock options, this court issued a Status

13  (Pretrial Scheduling) Order on November 8, 2007, to govern the

14  subsequent phase of plaintiff's appeal from his denial of

15  benefits.  (Docket No. 72.)  After the parties filed their trial

16  briefs, the court continued the scheduled bench trial to permit

17  supplemental briefing on the import of a recently issued Supreme

18  Court decision, <u>Metropolitan Life Insurance Co. v. Glenn</u>, 128 S.

19  Ct. 2343 (2008). (<u>Id.</u> No. 87.)  The court subsequently held a

20  bench trial based upon the administrative record, pursuant to the

21  procedures prescribed in <u>Kearney v. Standard Ins. Co.</u>, 175 F.3d

22  1084 (9th Cir. 1999), at which the court heard the arguments of

23  counsel and took the matter under submission.

24  II.  <u>Discussion</u>

25      A.   <u>Legal Standard</u>

26        "[A] denial of benefits 'is to be reviewed under a de

27  novo standard unless the benefit plan gives the administrator or

28  fiduciary discretionary authority to determine eligibility for

15

benefits or to construe the terms of the plan.'" <u>Burke v. Pitney Bowes Inc. Long-Term Disability Plan</u>, 544 F.3d 1016, 1023 (9th Cir. 2008) (quoting <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989)). "When a plan unambiguously gives the plan administrator discretion to determine eligibility or construe the plan's terms, a deferential abuse of discretion standard is applicable." <u>Id.</u> at 1023-24 (citing <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F.3d 955, 963 (9th Cir. 2006) (en banc)). "An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." <u>Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan</u>, 410 F.3d 1173, 1178 (9th Cir. 2005) (citing <u>Bendixen v. Standard Ins. Co.</u>, 185 F.3d 939, 944 (9th Cir. 1999); <u>Atwood v. Newmont Gold Co.</u>, 45 F.3d 1317, 1323-24 (9th Cir. 1995)).

The plan in this case unambiguously grants MetLife discretion to determine eligibility or construe the plan's terms. (May 23, 2006 Order 8-9; <u>see</u> Sullivan Decl. Ex. A at 62 ("MetLife in its discretion has authority to interpret the terms, conditions, and provisions of the entire contract. This includes the Group Policy, Certificate and any Amendments.").) Accordingly, an abuse of discretion standard is appropriate.

As mentioned previously, MetLife both administers and funds the plan at issue. The Ninth Circuit has recognized that "an insurer that acts as both the plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest." <u>Abatie</u>, 458 F.3d at 965

16

1 (citing Tremain v. Bell Indus., Inc., 196 F.3d 970, 976 (9th Cir.

2 1999)).  Although an abuse of discretion standard still applies,

3 a structural conflict of interest "must be weighed as a 'facto[r]

4 in determining whether there is an abuse of discretion.'"  Id.

5 (quoting Firestone, 489 U.S. at 115) (alteration in original).

6 Specifically, "[a] district court, when faced with all the facts

7 and circumstances, must decide in each case how much or how

8 little to credit the plan administrator's reason for denying

9 insurance coverage."  Id. at 968.

10     In Metropolitan Life Insurance Co. v. Glenn, 128 S. Ct.

11 2343 (2008), the Supreme Court provided a framework "similar to

12 the one provided in Abatie" for determining "whether the dual

13 role of administering and funding an ERISA plan creates a

14 conflict of interest, and if so, how that conflict should be

15 considered in evaluating whether a plan administrator has abused

16 its discretion."  Burke, 544 F.3d at 1024.

17     First, the Court agreed with Abatie's recognition that

18 a conflict of interest exists where an administrator "both funds

19 the plan and evaluates the claims."  Glenn, 128 S. Ct. at 2348.

20 The Court further noted that the abuse of discretion standard

21 applied despite the structural conflict of interest.  Id. at

22 2349-50.  The reviewing court, however, must "take account of

23 that conflict" as "one factor among many" when determining

24 whether the administrator has abused its discretion.  Id. at

25 2349, 2351.

26     B.   Determining Which Stock Options to Value

27     "An ERISA plan administrator abuses its discretion if

28 it construes provisions of the plan in a way that 'conflicts with

the plain language of the plan.'"  <u>Saffle v. Sierra Pac. Power</u>
<u>Co. Bargaining Unit Long Term Disability Income Plan</u>, 85 F.3d
455, 458 (9th Cir. 1996) (quoting <u>Taft v. Equitable Life</u>
<u>Assurance Soc'y</u>, 9 F.3d 1469, 1472 (9th Cir. 1993)).  To make its
assessment, a district court must not determine "whose
interpretation of the plan . . . is most persuasive, but whether
the [administrator's] interpretation is unreasonable."  <u>Canseco</u>
<u>v. Constr. Laborers Pension Trust for S. Cal.</u>, 93 F.3d 600, 606
(9th Cir. 1996) (quoting <u>Winters v. Costco Wholesale Corp.</u>, 49
F.3d 550, 553 (9th Cir. 1995)).

     1.   <u>Plaintiff's First Proposal</u>

     As discussed above, the plan in this case provides that
LTD benefits are calculated using a claimant's "predisability
earnings," which are defined as "gross salary or wages from [the]
Employer as of the day before . . . Disability began," including
"commissions and/or performance bonuses averaged over the
previous 12 months."  (Sullivan Decl. Ex. A at 86.)  To determine
his "performance bonuses averaged over the previous 12 months,"
plaintiff proposed using the income he derived from the exercise
of stock options during the final year of his employment.  (SAR
3302.)  MetLife, however, rejected this proposal in favor of
valuing stock options granted during the relevant time period.
(<u>Id.</u> at 3418.)  In doing so, MetLife adopted the view of Mr.
Skwire, who opined that the plan should not be interpreted to
effectively permit claimants to control the calculation of their
LTD benefits.  (<u>Id.</u> at 3404-05.)

     The plain language of the plan does not indicate
whether stock options exercised or granted during the key year

are the appropriate measure for LTD benefits.  MetLife's decision
to value stock-option grants, however, does not appear
unreasonable in light the "moral hazard" implicated by
plaintiff's proposal.  Indeed, it seems that plaintiff's experts
also concluded that valuing stock options granted during the key
year was an appropriate interpretation of the plan.  (See id. at
3528 (noting that "adhering to the contract language" would
require "calculat[ing] predisability income based on stock
options actually granted for the year prior to disability").)
Since this interpretation neither conflicts with the plain
language of the plan nor relies on clearly erroneous findings of
fact, the court finds that MetLife did not abuse its discretion
in rejecting plaintiff's first proposal.

2.   <u>Dr. Findlay's "Quasi-Equity Framework"</u>

To calculate plaintiff's LTD benefits, Dr. Findlay
valued a hypothetical stock-option grant of 16,000 option-shares.
Dr. Findlay explained that this number represented the typical
amount of stock option-shares granted to plaintiff each year
between 1995 and 2002.  (Id. at 3368.)  He called this approach a
"quasi-equity framework" in which "[t]he Running Average of
around 16,000 shares per year for ESOs . . . [could] be viewed as
an effort to capture the long-run expectation [of the parties]."
(Id. at 3538.)

In contrast, the F&M Report valued each of the three
stock-option grants that occurred during plaintiff's final year
at PeopleSoft.  Dr. Findlay labeled this approach "the Contract
View" and described it as "forc[ing] ESOs into the contract
terms, assum[ing] they are more like cash bonuses than wages, and

19

1   focus[ing] on the 12 months prior to the declaration of
2   disability." (Id. at 3538-39.)  Dr. Findlay justified his
3   rejection of this view by explaining, "As an over-time incentive,
4   ESO benefits . . . are difficult to measure over discrete
5   intervals. . . .  Both logic and equity dictate a less literal
6   approach." (Id. at 3366.)

7           Although Dr. Findlay adopted "a less literal approach"
8   to interpreting the plan, case law provides that a "primary
9   purpose of ERISA is to ensure the integrity and primacy of the
10  written plans. . . .  Thus, the plain language of an ERISA plan
11  should be given its literal and natural meaning." Health Cost
12  Controls v. Isbell, 139 F.3d 1070, 1072 (6th Cir. 1997) (citing
13  Duggan v. Hobbs, 99 F.3d 307, 309-10 (9th Cir. 1996)).  Here, the
14  plan defines "predisability earnings" to include "performance
15  bonuses averaged over the previous 12 months." (Sullivan Decl.
16  Ex. A at 86 (emphasis added).)  This provision plainly refers to
17  compensation within a specific twelve-month time period, not a
18  "Running Average" of compensation occurring over the seven years
19  preceding disability.  In its communications to plaintiff,
20  MetLife also appears to acknowledge this reading of the plan.
21  (See, e.g., SAR at 3418 ("[T]o follow the Court's direction that
22  we value stock options awarded your client in calculating
23  predisability earnings under the Plan, we must determine the
24  value of the performance-based stock options awarded in the 12
25  months preceding the last day worked.").)  Accordingly, Dr.
26  Findlay's construction conflicts with the plain language of the
27  plan.

28          Dr. Findlay suggested, however, that the F&M Report

also conflicted with the plain language of the plan in certain
respects.  First, although all of the stock-option grants were
made pursuant to PeopleSoft's Executive Incentive Compensation
Plan, Dr. Findlay contended that the April 2002 grant was a "de
facto repricing" of the January 2002 grant, not a bonus
qualifying as "predisability earnings."  (Id. at 3368-69.)
Second, Dr. Findlay argued that the May 2001 grant should not
qualify as "predisability earnings" because, while performance-
based, this grant "had no necessary relation to contemporaneous
performance" during plaintiff's final twelve months at
PeopleSoft.  (Id. at 3367 (emphasis added).)

As to Dr. Findlay's first contention, he provides
little reliable evidence to support his conclusion that the April
2002 grant was a "de facto repricing."  In his reports, he notes
that PeopleSoft's stock price "fell by half in the early months
of 2002" and that the April 2002 grant approximated the
corresponding decrease in the value of the January 2002 grant.
(Id. at 3368, 3540.)  Due to plaintiff's disability, Dr. Findlay
also found it "unlikely that this was a period of accelerating
superior performance."  (Id. at 3369.)  Dr. Findlay supported
this hypothesis by noting that the combined shares from the
January and April 2002 grants totaled 32,000 shares, which was
"2-3-4 [times] that of any other period."  (Id. at 3541.)

Plaintiff explained, however, that "the April 2002
option grants were the annual performance stock option grants
given to [him] as part of [his] annual review."  (Id. at 3517.)
Plaintiff continued, "When PeopleSoft repriced stock options,
they would cancel the lot of stock options being repriced, and

the repricing would be documented and reflected in my stock option report." (<u>Id.</u>)  This occurred, for example, in December 1998, when PeopleSoft repriced options it had granted in April 1998.  (<u>Id.</u>)  When presented with plaintiff's discussion of "de jure" repricing, Dr. Findlay dismissed it as "irrelevant" because the repricing hypothesis was only "one justification" for his chosen methodology.  (<u>Id.</u> at 3539.)  He later noted, "I did provide several alternative computations for various interpretations of these events." (<u>Id.</u> at 3533.)

        In addition, Dr. Findlay was incorrect in stating that 32,000 shares was two- to four-times that received in "any other period."  To make this statement, Dr. Findlay looked solely to options granted each calendar year; the plan, however, refers to a twelve-month period, which could potentially fall into two calendar years.  (<u>See</u> Sullivan Decl. Ex. A at 86.)  For example, Dr. Findlay observed that plaintiff received grants of 12,800 option-shares in 1995 and 28,000 option-shares in 1996.  (<u>Id.</u> at 3541.)  Dr. Findlay did not recognize, however, that 40,800 option-shares were granted in the twelve-month period from March 31, 1995, to March 30, 1996.  (<u>See</u> SAR 3368, 3375.)

        Aside from the information already discussed, Dr. Findlay provided that MetLife "ha[d] no further information as to documents or individuals who could provide insights on how or why these ESOs . . . were awarded." (<u>Id.</u> at 3541.)  Accordingly, the court finds that, considering the paucity of reliable evidence, it would be an abuse of discretion to exclude the April 2002 grant from the calculation of plaintiff's LTD benefits.  <u>See</u> <u>Boyd</u> <u>v. Bert Bell/Pete Rozelle NFL Players Ret. Plan</u>, 410 F.3d 1173,

1178 (9th Cir. 2005) (providing that an administrator's finding
constitutes an abuse of discretion when, "although there is
evidence to support it, the reviewing [body] on the entire
evidence is left with the definite and firm conviction that a
mistake has been committed." (quoting Concrete Pipe & Prods. of
Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508
U.S. 602, 622 (1993)) (alteration in original)); see also Riffey
v. Hewlett-Packard Co. Disability Plan, No. 05-1331, 2007 WL
946200, at *14 (E.D. Cal. Mar. 27, 2007) (providing that "[a]n
administrator's decision is an abuse of discretion" where it is
"unsupported by substantial evidence" (citing Taft v. Equitable
Life Ins. Co., 9 F.3d 1469, 1472 (9th Cir. 1998)).

        As to the May 2001 grant, MetLife adopted Dr. Findlay's
view that "these options plainly had nothing to do with
[plaintiff's] performance in the key year and therefore should be
excluded from the Plan's definition of 'performance bonuses.'"
(Id. at 3419.)  The court notes, however, that the plan does not
expressly provide that both compensation and the corresponding
performance must occur within the key year for purposes of
calculating LTD benefits.  (See Sullivan Decl. Ex. A at 86.)  It
is unclear, therefore, whether the requirement of contemporaneous
performance is an "interpretation" of the plan or whether MetLife
is "attempting to impose additional conditions . . . above and
beyond those required by the terms of the plan." Canseco v.
Constr. Laborers Pension Trust for S. Cal., 93 F.3d 600, 606 (9th
Cir. 1996) (citing Blau v. Del Monte Corp., 748 F.2d 1348, 1356
(9th Cir. 1985)).  Indeed, although a plan may grant an
administrator "discretionary authority . . . to construe the

23

terms of the plan," id. at 605 (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)), "a [plan] administrator lacks discretion to rewrite the [p]lan," id. at 609 (quoting Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan, 85 F.3d 455, 459-60 (9th Cir. 1996)) (alterations in original).

In reviewing MetLife's interpretation of the plan to exclude the May 2001 grant, the court also weighs certain policy considerations underlying the rule of contra proferentem.  Contra proferentem "is based upon the principle of contract construction that when one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against the drafter." Winters v. Costco Wholesale Corp., 49 F.3d 550, 554 (9th Cir. 1995) (quoting Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534, 537 (9th Cir. 1990)).  Construing ambiguity against the drafter "encourages administrator-insurers to write clear plans that can be predictably applied to individual claims, countering the temptation to boost profits by drafting ambiguous policies and construing them against claimants." Carolina Care Plan Inc. v. McKenzie, 467 F.3d 383, 389 (4th Cir. 2006).

Although contra proferentem does not apply where an administrator has discretion to construe a plan's provisions, Winters, 49 F.3d at 554, it may wield some influence where an administrator functions under a structural conflict of interest, Hawkins-Dean v. Metro. Life Ins. Co., 514 F. Supp. 2d 1197, 1200 (C.D. Cal. 2007) ("The Court, applying a less deferential abuse of discretion review, believes that because of this ambiguity, it

should apply the doctrine of <u>contra</u> <u>proferentem</u> and interpret any ambiguities in favor of the non-drafting party."); <u>see</u> <u>Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc.</u>, 125 F.3d 794, 799 (9th Cir. 1997) (applying <u>contra</u> <u>proferentem</u> in light of an administrator's conflict of interest, even though the plan vested the administrator with the discretionary authority to construe its terms); <u>see also</u> <u>McKenzie</u>, 467 F.3d at 389 ("When an ERISA plan vests discretion in an administrator who also insures the plan, reasonable exercise of that discretion requires that the administrator construe plan ambiguities against the party who drafted the plan.").

Dr. Findlay suggests that decoupling compensation from performance in the key year would make the amount of LTD benefits subject to random happenstance.  (<u>See</u> SAR 3532 ("Had the prior grant been made a little earlier and the current grant a little later, neither would have been included.  Can there be any doubt that a cry of inequity would have been heard?  In parallel fashion, it seems that two years worth of annual grants should not be included.").)  However, requiring both performance and compensation to occur during the key year would only insulate MetLife from paying a "windfall" to beneficiaries; it would not protect a beneficiary who performs during the key year but incurs a disability before receiving his or her bonus.[3]

---

[3]     The court observes that using a "running average" of previous years' bonuses would protect both the administrator and beneficiaries alike in these scenarios.  As discussed previously, however, this construction would conflict with the plain language of the plan.  In addition, in light of the structural conflict of interest in this case, the court cannot lightly presume that MetLife would ignore the terms of the contract solely to benefit the claimant.  In other words, using Dr. Findlay's rhetorical

1       In addition, to consistently apply this interpretation,
2  MetLife would need some way of determining whether plaintiff's
3  January 2002 grant was based entirely, or only partially, on
4  performance during the key year.  Dr. Findlay did not attempt to
5  do so (id. at 3538-39 (finding no need to determine "whether the
6  ESOs during that period were really awarded for performance"),
7  and it appears that MetLife lacked sufficient information to
8  conduct such analyses (id. at 3541 (noting that MetLife "has no
9  further information as to documents or individuals who could
10  provide insights on how or why these ESOs . . . were awarded").

11       In sum, the court acknowledges Dr. Findlay's assertion
12  that the "function of disability insurance" is to replace the
13  "reasonable expectation of . . . long-run earnings" and that "a
14  single year may be quite inadequate to forecast . . . ESOs." (Id.
15  at 3538).  The appropriate solution, however, is to draft a more
16  precise method for determining LTD benefits other than
17  "performance bonuses averaged over the previous 12 months."
18  (Sullivan Decl. Ex. A at 86.)  MetLife cannot now interpret a new
19  "contemporaneous-performance" requirement into the plan in order
20  to balance its perception of the equities in this case.  (See SAR
21  at 3366.)  Accordingly, in light of the foregoing concerns,
22  MetLife's structural conflict of interest, and the rule of contra
23  proferentem, the court concludes that MetLife's interpretation of
24  the plan to exclude the May 2001 grant was not reasonable.

25       C.   Valuing Plaintiff's Stock Options

26  ─────────────────────────
27  form, "had the prior grant been made a little earlier and the
   current grant a little later, neither would have been included;
28  can there be any doubt" that MetLife would then adhere to the
   terms of the contract?  (Id.)

Since Dr. Findlay originally valued a hypothetical grant of 16,000 option-shares, he did not need to apply his valuation method to the three stock-option grants that occurred during plaintiff's final twelve months at PeopleSoft.  However, in a subsequent report, Dr. Findlay did provide per-share values for the three stock-option grants using his methodology.  (<u>Id.</u> at 3546.)  In doing so, he intended to demonstrate that his estimates were "reasonably similar to those of the [F&M] Report." (<u>Id.</u>)[4]  These per-share values were $17.62 for the May 2001 grant, $17.92 for the January 2002 grant, and $9.94 for the April 2002 grant.  (<u>Id.</u>)[5]

When multiplied by the respective number of shares in each grant (12,500, 20,000, and 12,000 shares), these values amount to a total of $697,930.  According to Dr. Findlay's methodology, a discount of forty-six percent is then taken in order to account for the non-hedgability and non-transferability of the ESOs (<u>id.</u> at 3548), yielding $376,882.20.  Then, pursuant

---

[4]   As MetLife acknowledged in its trial brief, "there is little practical difference between Dr. Findlay's method and the method the F&M Report advocates." (Defs.' Trial Br. 23.) Rather, any difference "is mostly due to two factors: . . . that MetLife is basing its calculation on the award of 16,000 shares, and second, that MetLife is using a lower volatility rate than is McAfee." (<u>Id.</u> at 21.)

[5]   Dr. Findlay calculated these per-share values using a maturity of five years and a volatility of 0.5.  (<u>Id.</u>)  In his original report, Dr. Findlay used a maturity of ten years and volatilities of 0.3 and 0.5, and he then averaged the results. (<u>Id.</u> at 3375, 3378.)  Following these steps yields per-share values of $21.14 for the May 2001 grant, $20.47 for the January 2002 grant, and $11.41 for the April 2002 grant. (<u>See</u> <u>id.</u> at 3375.)  Since these values are even greater than those provided in Dr. Findlay's subsequent report, the court's election to apply the values from Dr. Findlay's subsequent report will not prejudice MetLife.

1 to the terms of the plan, plaintiff's monthly LTD benefit is

2 calculated by taking sixty percent of this figure and dividing it

3 by twelve (id.), which amounts to $18,844.11 per month.

4     Plaintiff's current LTD benefit payment, which is based

5 on his previous salary at PeopleSoft, is $8765.78 per month.

6 (Id. at 3048.)  When this figure is added to the monthly payment

7 derived from his stock options, the total monthly payment exceeds

8 the $25,000 limit imposed by the plan.  (Sullivan Decl. Ex. A at

9 70.)  Accordingly, since the valuation methods proposed by Dr.

10 Findlay and the F&M Report yield the same monthly payment, the

11 court need not determine whether MetLife's adoption of Dr.

12 Findlay's approach was unreasonable.

13     D.   Prejudgment Interest

14     Plaintiff requests an award of prejudgment interest on

15 the amount of unpaid LTD benefits that have accrued.  "Whether to

16 award prejudgment interest to an ERISA plaintiff is 'a question

17 of fairness, lying within the court's sound discretion, to be

18 answered by balancing the equities.'"  Landwehr v. DuPree, 72

19 F.3d 726, 739 (9th Cir. 1995) (quoting Shaw v. Int'l Ass'n of

20 Machinists & Aerospace Workers Pension Plan, 750 F.2d 1458, 1465

21 (9th Cir. 1985)).  Prejudgment interest "is an element of

22 compensation, not a penalty, and is primarily concerned with

23 making an aggrieved party whole."  Hawkins-Dean v. Metro. Life

24 Ins. Co., 514 F. Supp. 2d 1197, 1200 (C.D. Cal. 2007) (citing

25 Dishman v. UNUM Life Ins. Co. of Am., 269 F.3d 974, 988 (9th Cir.

26 2001)).

27     In deciding whether to award prejudgment interest, a

28 district court must consider a number of factors, including

whether prejudgment interest is necessary to compensate the plaintiff fully for his injuries, the degree of personal wrongdoing on the part of the defendant, the availability of alternative investment opportunities to the plaintiff, whether the plaintiff delayed in bringing or prosecuting the action, and other fundamental considerations of fairness.

Osterneck v. Ernst & Whinney, 489 U.S. 169, 176 (1989).  Over the past six years, plaintiff has not received the full disability payments to which he was entitled.  Furthermore, although the court cannot conclude that MetLife acted in bad faith, the court notes that MetLife originally denied plaintiff's disability claim in its entirety and reinstated his benefits only after he mounted an appeal; as the Ninth Circuit has noted, the "denial and subsequent concession of eligibility for disability benefits [is] material, probative evidence tending to show that [an administrator's] decision regarding the amount of benefits due . . . was affected by self-interest."  Hawkins-Dean v. Metro. Life Ins. Co., 161 F. App'x 684, 686 (9th Cir.) (citing Atwood v. Newmont Gold Co., 45 F.3d 1317, 1322-23 (9th Cir. 1995)), vacated and remanded on other grounds, 127 S. Ct. 659 (2006).  Finally, the court finds that plaintiff did not unreasonably delay in bringing this action, and MetLife has not suggested that plaintiff's efforts were dilatory.  Accordingly, the court finds that the balance of the equities favors an award of prejudgment interest.

     "Generally, 'the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate.'"  Blankenship v.

1    Liberty Life Assurance Co. of Boston, 486 F.3d 620, 628 (9th Cir.

2    2007) (quoting Grosz-Salomon v. Paul Revere Life Ins. Co., 237

3    F.3d 1154, 1164 (9th Cir. 2001)).  Here, the parties agree that

4    28 U.S.C. § 1961 should govern any award of prejudgment interest

5    (Pl.'s Trial Br. 25-26; Defs.' Reply Trial Br. 13), and the court

6    finds no reason to deviate from the rate prescribed under the

7    statute.  Accordingly, prejudgment interest will be calculated

8    using "a rate equal to the weekly average 1-year constant

9    maturity treasury yield, as published by the Board of Governors

10   of the Federal Reserve system, for the calendar week preceding

11   the date of judgment."  28 U.S.C. § 1961(a).

12        E.   Attorney's Fees and Litigation Costs

13             1.   Appropriateness of Awarding Attorney's Fees

14             Plaintiff requests an award of attorney's fees and

15   litigation costs pursuant to ERISA.  See 29 U.S.C. § 1132(g)(1)

16   ("In any action under this subchapter . . . by a participant,

17   beneficiary, or fiduciary, the court in its discretion may allow

18   a reasonable attorney's fee and costs of action to either

19   party.").  The Ninth Circuit follows a five-factor test for

20   awarding attorney's fees under ERISA, which considers:

21            (1) the degree of the opposing parties' culpability or
         bad faith; (2) the ability of the opposing parties to
22       satisfy an award of fees; (3) whether an award of fees
         against the opposing parties would deter others from
23       acting under similar circumstances; (4) whether the
         parties requesting fees sought to benefit all
24       participants and beneficiaries of an ERISA plan or to
         resolve a significant legal question regarding ERISA; and
25       (5) the relative merits of the parties' positions.

26   Hummell v. S.E. Rykoff & Co., 634 F.2d 446, 453 (9th Cir. 1980).

27   "No one of the Hummell factors, however, is necessarily decisive,

28   and some may not be pertinent in a given case."  Carpenters S.

1  Cal. Admin. Corp. v. Russell, 726 F.2d 1410, 1416 (9th Cir.

2  1984).  The factors "reflect a balancing" of the equities, and

3  the court "need not find that each factor weighs in support of

4  fees" in order to grant an award.  McElwaine v. US W., Inc., 176

5  F.3d 1167, 1173 (9th Cir. 1999).

6       As mentioned previously, while certain facts in this

7  case may suggest bad faith on MetLife's part, the court does not

8  find such evidence wholly persuasive.  Thus, this factor weighs

9  neither against nor in favor of awarding attorney's fees.  As to

10  the second factor, MetLife does not contest that it is capable of

11  satisfying an award of attorney's fees (Defs.' Reply Trial Br.

12  15); therefore, this factor weighs in favor of granting the

13  request.

14       As to the third Hummell factor, MetLife contends that

15  an award of attorney's fees would not deter similarly situated

16  administrators "[g]iven the unusual and complicated nature of the

17  question before MetLife and the [c]ourt."  (Id. at 16.)  Although

18  the court does not dispute that the valuation of stock options is

19  a "complicated enterprise," Scully v. US WATS, Inc., 238 F.3d

20  497, 508 (3d Cir. 2001), the decisive aspects of this matter

21  involved contractual interpretation, not the propriety of certain

22  assumptions underlying the Black-Scholes model.  Since the court

23  concluded that MetLife's interpretation of the plan terms was

24  unreasonable, an award of attorney's fees and costs will serve a

25  deterrent effect upon other administrators faced with similar

26  decisions.  See Sluimer v. Verity, Inc., No. 08-1220, 2008 WL

27  5048434, at *3 (N.D. Cal. Nov. 24, 2008) ("An award of attorneys'

28  fees based on a plan administrator's incorrect decision signals

1   to other plan administrators that they should not similarly abuse

2   their discretion.").

3          The fourth <u>Hummell</u> factor, which examines whether

4   plaintiff's action has benefitted other beneficiaries under an

5   ERISA plan, also counsels in favor of awarding attorney's fees.

6   Plaintiff's prosecution of this action has clarified whether

7   performance-based stock options qualify as "predisability

8   earnings" under the plan.  As plaintiff's own situation

9   demonstrates, performance-based stock options can constitute a

10  significant component of one's compensation; whether they are

11  considered for calculating disability payments, therefore, will

12  have a marked effect on similarly situated beneficiaries.  <u>See,</u>

13  <u>e.g.</u>, <u>Hawkins-Dean v. Metro. Life Ins. Co.</u>, 514 F. Supp. 2d 1197,

14  1200 (C.D. Cal. 2007) (reversing an administrator's determination

15  that stock options did not constitute "earnings" or a "bonus"

16  under the terms of the plan); <u>see also</u> <u>Smith v. CMTA-IAM Pension</u>

17  <u>Trust</u>, 746 F.2d 587, 590 (9th Cir. 1984) ("[A] decision

18  clarifying the terms of a plan after litigation would 'benefit

19  all participants and beneficiaries' by settling a disputed

20  provision or an ambiguity.").

21         The final <u>Hummell</u> factor considers the relative merits

22  of the parties' positions.  MetLife argues that "[i]f the task of

23  calculating stock options is inherently difficult, that serves to

24  equalize the merits of the opposing positions." (Defs.' Reply

25  Trial Br. 16.)  As mentioned previously, however, the

26  complexities of stock-option valuation did not predominate the

27  court's resolution of this matter.  Rather, in both phases of the

28  litigation, plaintiff prevailed in demonstrating that MetLife's

                                    32

interpretation of the plan's terms was unreasonable.  Therefore, the final Hummell factor weighs in favor of granting an award of attorney's fees.

Although the court does not find that MetLife acted in bad faith, "bad faith is not a prerequisite to an ERISA fee award."  McElwaine v. US W., Inc., 176 F.3d 1167, 1173 (9th Cir. 1999) (citing Smith, 746 F.2d at 590).  In addition, "if a plan participant or beneficiary prevails in an action to enforce his rights under the plan, recovery of attorneys' fees is appropriate, absent special circumstances making an award unjust."  Canseco v. Constr. Laborers Pension Trust for S. Cal., 93 F.3d 600, 609-10 (9th Cir. 1996) (citing Smith v. Ret. Fund Trust of the Plumbing, Heating & Piping Indus. of S. Cal., 857 F.2d 587, 592 (9th Cir. 1988)).  Accordingly, since four of the five Hummell factors favor an award of attorney's fees, the court finds that such an award is appropriate.

## 2.   Reasonableness of the Calculation

The Ninth Circuit has adopted the "hybrid lodestar/multiplier approach . . . as the proper method for determining the amount of attorney's fees in ERISA actions."  Van Gerwen v. Guarantee Mut. Life Co., 214 F.3d 1041, 1045 (9th Cir. 2000) (citing McElwaine, 176 F.3d at 1173).  This approach has two parts.  First, a court "multipl[ies] the number of hours reasonably expended on the litigation by a reasonable hourly rate."  Id. (citing D'Emanuele v. Montgomery Ward & Co., 904 F.2d 1379, 1383 (9th Cir. 1990)).  The party requesting attorney's fees "must submit evidence supporting the hours worked and the rates claimed."  Id. (citing Hensley v. Eckerhart, 461 U.S. 424,

33

433 (1983)).  Second, a court "may adjust the lodestar upward or downward using a 'multiplier' based on factors not subsumed in the initial calculation of the lodestar."  Id. (citing Blum v. Stenson, 465 U.S. 886, 898-901 (1984)).[6]  The lodestar amount "is presumptively the reasonable fee amount, and thus a multiplier may be used to adjust the lodestar amount upward or downward only in 'rare' and 'exceptional' cases."  Id. (quoting Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986)).

Here, plaintiff's counsel has submitted documents and supporting declarations detailing the hours expended and the types of services provided in this case, as well as the applicable billing rates for himself, co-counsel, and two legal assistants.  (See Pl.'s Trial Br. App'x 1-10; Mar. 24, 2008 deVries Decl. 1-4.)  He states that the total attorney-time spent on this matter amounted to 246.6 hours, while the time expended by legal assistants amounted to 20.8 hours.  (Pl.'s Trial Br. App'x 10; Pl.'s Revised Calculations 2-3.)

After carefully reviewing these documents, and noting no objection from MetLife, the court finds no need to exclude any of the reported hours as "excessive, redundant, or otherwise unnecessary."  Van Gerwen, 214 F.3d at 1045.  This includes hours

---

[6]     Under Hensley, relevant factors include (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) time limitations imposed by the client or the circumstances; (7) the amount involved and the results obtained; (8) the experience, reputation and ability of the attorneys; (9) the "undesirability" of the case; (10) the nature and length of the professional relationship with the client; and (11) awards in similar cases.  461 U.S. at 430 n.3.

expended by legal assistants, <u>Dishman v. UNUM Life Ins. Co. of Am.</u>, 269 F.3d 974, 987 (9th Cir. 2001), and hours related to the court-ordered remand process occurring after the first phase of this litigation.  Although the Ninth Circuit has not addressed whether fees relating to court-ordered remand proceedings are recoverable under ERISA, the court finds the reasoning of the Second Circuit persuasive on this issue.  <u>See</u> <u>Peterson v. Cont'l Cas. Co.</u>, 282 F.3d 112, 119-20 (2d Cir. 2002) ("[O]nce a court of law has assumed jurisdiction over a suit, all costs incurred may be shifted by a court to one party.  The fact that a court orders additional fact finding or proceedings to occur at the administrative level does not alter the fact that those proceedings are part of the 'action' as defined by ERISA."); <u>see also, e.g.</u>, <u>Johnson v. Prudential Ins. Co. of Am.</u>, No. 06-0130, 2008 WL 901526, at *10 (S.D. Tex. Mar. 31, 2008) (following <u>Peterson</u>); <u>Younkin v. Prudential Ins. Co. of Am.</u>, No. 05-48, 2007 WL 1378413, at *6 (D. Mont. May 3, 2007) (same); <u>Seal v. John Alden Life Ins. Co.</u>, 437 F. Supp. 2d 674, 676 (E.D. Mich. 2006) (same).[7]

---

[7]   The court notes that by adopting the Second Circuit's approach, its decision is somewhat at odds with its prior ruling in <u>Kniespeck v. Unum Life Ins. Co. of Am.</u>, No. 01-0878, 2007 WL 496346, at *7 (E.D. Cal. Feb. 13, 2007).  In <u>Kniespeck</u>, the court declined to follow <u>Peterson</u> because "when th[e] court remanded the claim back to [the administrator], [the court] had not ruled on the primary substantive dispute, only the proper context for plaintiff's claim."  <u>Id.</u> (citing <u>Cann v. Carpenters Pension Trust Fund for N. Cal.</u>, 989 F.2d 313 (9th Cir. 1993)).  In this case, however, the court granted plaintiff's motion for summary judgment on whether his stock options constituted predisability earnings under the plan before remanding the case to the administrator; afterward, the only issue to be determined on remand was the amount of his recovery.  (May 23, 2006 Order 14.)  Therefore, the aspect of <u>Kniespeck</u> that counseled against following <u>Peterson</u> is not present in this case.

1    Plaintiff's counsel charges $400 per hour for himself

2  and his co-counsel, a senior attorney, and a rate of $110 per

3  hour for two legal assistants.  Defendants do not challenge the

4  reasonableness of these rates.  "[T]he established standard when

5  determining a reasonable hourly rate is the 'rate prevailing in

6  the community for similar work performed by attorneys of

7  comparable skill, experience, and reputation.'"  Camacho v.

8  Bridgeport Fin., Inc., 523 F.3d 973, 979 (9th Cir. 2008) (quoting

9  Barjon v. Dalton, 132 F.3d 496, 502 (9th Cir. 1997)).

10  "Generally, the relevant community is the forum in which the

11  district court sits," Barjon, 132 F.3d at 500, although "it is

12  appropriate to consider . . . other jurisdictions because ERISA

13  cases involve a national standard, and attorneys practicing ERISA

14  law in the Ninth Circuit tend to practice in different

15  districts," Mogck v. Unum Life Ins. Co. of Am., 289 F. Supp. 2d

16  1181, 1191 (S.D. Cal. 2003).  "[A]ffidavits of the plaintiff['s]

17  attorney[] . . . and rate determinations in other cases . . . are

18  satisfactory evidence of the prevailing market rate."  Id. at 980

19  (quoting United Steelworkers of Am. v. Phelps Dodge Corp., 896

20  F.2d 403, 407 (9th Cir. 1990)).

21    Plaintiff's counsel has been a civil litigation

22  attorney for over thirty years.  (Mar. 24, 2008 deVries Decl. 4.)

23  He specializes in insurance claims cases and has written widely

24  published articles on the subject.  (Id.)  In addition, a judge

25  in this court recently approved hourly rates in an ERISA case of

26  $495 for a partner, $295 per hour for an associate, and $150 per

27  hour for a paralegal.  Aquilar v. Melkonian Enters., Inc., No.

28  05-32, 2007 WL 201180, at *8 (E.D. Cal. Jan. 24, 2007); see also

36

Kniespeck v. Unum Life Ins. Co. of Am., No. 01-0878, 2007 WL 496346, at *8 (E.D. Cal. Feb. 13, 2007) (approving a rate of $350 per hour for a partner and $100 per hour for a legal assistant). This appears consistent with other districts in the state. See Mardirossian v. Guardian Life Ins. Co. of Am., 457 F. Supp. 2d 1038, 1047 (C.D. Cal. 2006) (awarding $400 per hour for an ERISA attorney with over twenty years of experience); Farhat v. Hartford Life & Accident Ins. Co., No. 05-0797, 2006 WL 2521571, at *7 (N.D. Cal. Aug. 30, 2006) (finding that a reasonable rate for experienced ERISA attorneys falls between $400 and $495 per hour). Therefore, the court finds that a rate of $400 per hour for plaintiff's counsel and co-counsel and a rate of $110 per hour for two legal assistants are reasonable.

Multiplying the attorney and legal-assistant hours by the corresponding rates yields a total of $100,928 for attorney's fees. The court is not aware of any facts that would make this a "rare" or "exceptional" case requiring a multiplier to adjust the award upward or downward. Accordingly, the court will grant an award of attorney's fees of $100,928.

### 3. Litigation Costs

In an ERISA action, courts may award "only the types of 'costs' allowed by 28 U.S.C. § 1920, and only in the amounts allowed by section 1920 itself, by 28 U.S.C. § 1821 or by similar such provisions." Agredano v. Mut. of Omaha Cos., 75 F.3d 541, 544 (9th Cir. 1996).[8] Plaintiff provides a bill of costs

---

[8]    28 U.S.C. § 1920 provides:

A judge or clerk of any of the United states may tax as costs the following:

37

totaling $6409.42 for filing, service, records, mediation, and "miscellaneous" costs including travel. (Pl.'s Trial Br. App'x.) Of these costs, the expenses related to mediation and travel, which total $4617.08, are not recoverable under the applicable statutes. Accordingly, the court will exclude these expenses and award the remaining litigation costs in the amount of $1792.34.

III. <u>Conclusion</u>

The court finds that MetLife unreasonably adopted Dr. Findlay's report for purposes of calculating plaintiff's LTD benefits. A valuation consistent with the plain language of the plan would have considered all 44,500 stock-option shares granted during plaintiff's final twelve months at PeopleSoft, not a "Running Average" of stock options granted over his last seven years of employment. Properly valued, plaintiff's stock options increase his monthly LTD benefit payment to the maximum amount of $25,000 less plaintiff's receipt of Social Security income. (<u>See</u> Sullivan Decl. Ex. A at 70, 88.)

IT IS THEREFORE ORDERED that:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all and any part of stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in case;

(5) Docket fees under § 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under § 1828 of this title.

1        (1) plaintiff is entitled to a monthly LTD benefit

2   payment of $25,000 per month, less plaintiff's receipt of Social

3   Security income, for so long as he qualifies for LTD benefits;

4        (2) plaintiff is entitled to benefits withheld in the

5   amount of $1,201,316 as of December 2008;

6        (3) plaintiff is entitled to prejudgment interest on

7   benefits withheld in the amount of $158,298 as of December 2008;

8        (4) plaintiff is entitled to attorney's fees in the

9   amount of $100,928; and

10       (5) plaintiff is entitled to litigation costs in the

11  amount of $1792.34.

12       The Clerk is directed to enter judgment accordingly.

13  DATED:  December 11, 2008

14

15  _____

16  WILLIAM B. SHUBB
    UNITED STATES DISTRICT JUDGE

39